14 A.3d 1164

Jose **GARCIA–PERLERA**

v.

**STATE of Maryland.**

No. 1371, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 2, 2011.

Reconsideration Denied April 6, 2011.

536

538

Deborah S. Richardson (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., MATRICCIANI and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

Appellant, Jose Garcia–Perlera, appeared before the Circuit Court for Montgomery County on one count of felony murder, four counts of first degree burglary, one count of robbery with a dangerous weapon, four counts of false imprisonment, one count of first degree assault, and one count of use of a handgun in the commission of a felony. After a five-day trial

from May 11 to 15, 2009, a jury acquitted appellant of the use of a handgun in the commission of a felony and convicted him of all remaining charges. On August 13, 2009, the court sentenced appellant to incarceration for life, without parole, for the crime of felony murder, and to three concurrent sentences of life, plus thirty-five years, for the remaining crimes.

In his timely appeal, appellant raises four questions for our consideration:

 I. Did the trial court err in denying appellant's motion to sever?

 II. Did the trial court err in denying appellant's motion to suppress evidence seized as a result of two search warrants?

 III. Did the trial court err in failing to merge the sentences for false imprisonment into the sentences for robbery?

 IV. Did the trial court err in failing to merge the sentence for first degree assault into the sentence for robbery?

For the reasons set forth below, we affirm the judgments of the circuit court.

### FACTS AND PROCEEDINGS

Appellant's convictions arise from four burglaries perpetrated in Montgomery County between September, 2007, and September, 2008.

Margaret Arnold was ninety-four years old at the time of appellant's trial and resided alone in Bethesda, Maryland, along the "River Road corridor." On September 17, 2007, at approximately 10:45 p.m., Mrs. Arnold was accosted in the basement of her home by an unknown assailant. The assailant was wearing a mask, gloves, and black clothing, was approximately twenty years of age, a little taller than her height of 5' 4½", and described as male with a Hispanic accent. Using a piece of clothesline taken from her yard, the assailant tied Mrs. Arnold's wrists to her ankles and then gagged her. The intruder ransacked Mrs. Arnold's home, stealing her

watch, wedding and engagement rings, and other pieces of jewelry. Mrs. Arnold was discovered later that night by a family member.

Betty Tubbs resided alone in Chevy Chase, Maryland, also along the River Road corridor. On the night of November 27, 2007, the seventy-seven year old Mrs. Tubbs was accosted in the basement of her home by an unknown assailant wearing a baseball cap and a piece of beige cloth across his nose and mouth. Mrs. Tubbs described her assailant as approximately her height of 5' 5½", wearing dark clothing and a hat, and speaking with a Hispanic accent. Using rope, the assailant tied Mrs. Tubbs' wrists to her ankles, then gagged and blindfolded her. The intruder ransacked Mrs. Tubbs' home, stealing money, her laptop computer, and multiple items of costume jewelry. Shortly after the intruder left her home, Mrs. Tubbs managed to loosen the ropes that were binding her and to seek assistance at the home of a neighbor.

Ann Wolfe was seventy-nine years old and resided alone, along the River Road corridor of Potomac, Maryland. On the morning of February 27, 2008, Mrs. Wolfe was outside her home retrieving the newspaper when she was accosted by a Hispanic man, approximately twenty-five years of age, between 5'6" and 5'8" tall, wearing a theatrical costume.[1] Mrs. Wolfe's attacker spoke to her in Spanish. Her assailant dragged her into the basement of her home, hitting her on the head with a pistol three times. Using rope and duct tape, the intruder tied Mrs. Wolfe's hands to her feet. He then taped her mouth shut with duct tape and put a sheet over her head, which he tied with rope. Mrs. Wolfe's home was ransacked and her car stolen, along with cash, bottles of wine, and jewelry from a wall safe in her bedroom. After her attacker left, Mrs. Wolfe was able to chew through the duct tape so that she could breathe through her mouth. She was found by her daughter, two days later. Mrs. Wolfe was hospitalized for five days and suffered permanent damage to her hands.

---

1. Ms. Wolfe described her attacker's outfit as brown pants tucked into boots, a military jacket, and a hat without a brim.

Mary Francis Havenstein was sixty-three years old when she died in her home along the River Road corridor. Mrs. Havenstein was last seen alive by her neighbor on September 2, 2008. On September 4, 2008, Mrs. Havenstein's niece arrived to take her to a doctor's appointment and found her corpse. Mrs. Havenstein was on the floor in her bedroom with her hands tied to her feet. There were numerous abrasions and binding injuries to Mrs. Havenstein's body, but the fatal wound was an injury to her head consistent with blunt-force trauma. Mrs. Havenstein's car was missing from her garage, and jewelry was missing from her home.

Appellant was arrested in connection with multiple crimes on October 15, 2008. When police arrived at appellant's home to execute a search warrant, appellant said, "You're here for me." Items recovered from appellant's home were identified as having been stolen from the homes of each of the four victims. DNA specimens recovered from the Tubbs, Wolfe, and Havenstein crime scenes were consistent with appellant's DNA.

Additional facts will be provided as necessary to support our analysis of the issues.

## DISCUSSION

## I. Motion to Sever

### A. *Background*

Prior to trial, appellant moved for separate trials, contending that the counts related to each of the four incidents should be tried separately from the others to avoid prejudice. The State opposed, and after hearing arguments, the trial court ruled:

Before the Court is the defendant's motion to sever the counts in the indictment; from 1 and 4; from 6 through 8; from 9 through 11; from 12 through 17; and by agreement 18 and 19 have been and will be severed, but are to be tried each with the other.

As to the remaining counts, the Rules implicated are 4–253(c), which says that the offenses may be charged together if they are of the same or similar character. The State maintains, in this instance, they are. That notwithstanding, under Rule 4–253 the counts should be severed if they are unfairly prejudicial.

Clearly, based upon the evidence presented to the Court, as in a number of the cases as cited by counsel, the identity of the assailant is the primary issue in this indictment, and in the counts referred to. The Court further finds, based upon the proffer of facts, that the facts of each case in this particular matter are so distinctive that they do constitute what is occasionally referred to as a "signature crime," and that without trying to be exhaustive of the facts, the Court notes that each involves a home invasion; it is represented that each is within close proximity to the other. At one point there was reference to being almost within walking distance; each occurred on days, Monday—between Monday and Wednesday; but most significant for the Court each involved a victim being hog-tied, which is described as hands together, feet together, and feet to hands; each was tied up using ropes with knots that had been described as complex, but not identical; in each instance, the victim was gagged; and in each instance, the victim was—I don't know if "elderly" is appropriate given my own advanced years, but they were middle-aged victims, let me say but of similar age; and that each—if I didn't already mention it, obviously each was a woman. Based upon those facts, the Court finds there is, at the very least, a reasonable inference that the same person committed the four remaining offenses, which would make them relevant to the issues of identity and admissible in the other cases.

With respect to the issue of prejudice, as discussed already, all probative evidence is, to some degree, prejudicial, and the question is whether it is unfairly so. As I have mentioned, each—in each of these four cases, standing alone, there is some evidence that tends to suggest that the defendant might have been involved; but, in each instance,

the State is relying upon circumstantial evidence as to the issue of identity.

\* \* \*

And in the final case, the fourth case, which is Ms. Arnold's case, property stolen from her residence is recovered from the defendant's apartment, but it's recovered approximately 13 years—sorry—13 months after the theft took place.

Now, no one would question that if in fact, for instance, in Ms. Wolfe's case, in addition to the evidence of the DNA on the gag, that there was a stick recovered from her bedroom that had the defendant's DNA on it; that there was a hat recovered from another room, even if it was in a bag presumably that she would say was not hers; and that the hat and the bag had the DNA, the defendant's DNA on it; and that assume in Ms. Wolfe's case, the property stolen from her was recovered from the defendant's apartment 13 months later, no one would question that all of that evidence would be probative—would be admissible and probative of the issue of identity. In this case, because the Court finds it's reasonable to infer that the same person committed all four of these, then that evidence has the same probative value.

However, if instead you looked at each of these cases in isolation, the evidence would not nearly be as probative. So, while the Court cannot dispute the fact that joining them is prejudicial to the defendant, the Court does not find that it is unfairly prejudicial. And mindful that this requires the Court to exercise a good deal of discretion, and to be conscious and aware of the defendant's right to a fair trial, and the impact of prejudice, I have given some thought to severing Ms. Havenstein's case, where she died, from the other cases, because that case involves an allegation of murder, and the other three do not. Clearly, the other three would be admissible on the issue of identity if Havenstein's case was tried alone. So we are really talking about is it unduly prejudicial to allow them, that is, the State, to use Ms. Havenstein's case when they are trying the other

three, in light of the evidence available to them, by the consolidation of those three cases.

And I have given that a great deal of thought, but I have considered—if memory serves me correct, my understanding of the theory of murder in Ms. Havenstein's case is that she, like the other victims, was of, you know, elder years— or, not elder years, but was older; that she was hog-tied and gagged; and that it is not that the assailant intended her murder, as a murder in the first degree that was premeditated and deliberated; but rather, that this is a circumstance where the person who burglarized the home tied her up, as he had tied up other victims, and in this case, very unfortunately, she expired because she was not discovered for some period of time; that, assuming that is a correct analysis of those facts, then the case really is very similar to the other cases, but in that one there was a very unfortunate outcome, which frankly could have happened at any one of the others. So I don't think the prejudice from that, because although it doesn't affect the culpability of the person who did it, in terms of whether it is liable to inflame the jury or cause them to be unduly prejudiced against the defendant, I think that the chances of that are significantly lessened by the fact that it is not an intentional murder; it is rather a felony murder. And clearly the evidence in that case is as probative of the issue of identity, as is the evidence in any of the other three cases.

So, in trying to exercise my discretion as wisely and as fairly as I can, I find that it is not unduly or unfairly prejudicial in this case to allow the consolidation of the four cases, or to allow the four cases to be tried together; and accordingly, I deny the motion to sever those four cases into separate trials, and will direct that Counts 1 through 17 be tried together.

## B. *Analysis*

Appellant asserts that the court incorrectly concluded that evidence from the separate incidents was mutually admissible to prove their assailant's identity, in both senses of that

word: first, that they were all perpetrated by an identical assailant; and second, that the assailant's identity is appellant. Appellant argues that the crimes were not sufficiently unique or so distinctive as to establish a *modus operandi* of a single perpetrator. Alternatively, appellant contends that the judicial economy gained by consolidating all of the charges against him into a single trial was outweighed by the unfair prejudice he suffered as a result of the joinder. He concludes that his motion to sever should have been granted and that reversal is required.

The State responds that the court properly denied appellant's motion to sever. Specifically, it counters that the court properly found that the crimes alleged were sufficiently distinctive to establish a *modus operandi* and, therefore, were mutually admissible as "other crimes evidence" of identity. The State concludes that having properly applied the mutual admissibility test, the court then appropriately weighed the competing interests of judicial economy and prejudice to appellant in making its final determination regarding joinder.

Maryland Rule 4–253(c) addresses the prospect of prejudicial joinder and provides, as follows:

> If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires.

The seminal Maryland case on joinder—and its complement, severance—is *McKnight v. State*, 280 Md. 604, 375 A.2d 551 (1977). The *McKnight* Court examined Rule 745, the predecessor to Rule 4–253(c), in determining when joinder of offenses is so prejudicial to a criminal defendant that severance is required. *Id.* at 607–09, 375 A.2d 551. The Court noted that the justification for joinder is judicial economy. *Id.* at 608–09, 375 A.2d 551. It observed, however, that where the evidence is not mutually admissible, the value of resources saved by consolidating the cases for trial is questionable. *Id.* at

609, 375 A.2d 551. The Court then explained three ways in which such joinder may prejudice a criminal defendant:

> First, he may become embarrassed, or confounded in presenting separate defenses. Secondly, the jury may cumulate the evidence of the various crimes charged and find guilt when, if the offenses were considered separately, it would not do so. At the very least, the joinder of multiple charges may produce a latent hostility, which by itself may cause prejudice to the defendant's case. Thirdly, the jury may use the evidence of one of the crimes charged, or a connected group of them, to infer a criminal disposition on the part of the defendant from which he may also be found guilty of other crimes charged.

*Id.* (internal citations omitted).

After examining how other jurisdictions reconcile the competing considerations of prejudice to the defendant and judicial economy, the *McKnight* Court held that "a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." *Id.* at 612, 375 A.2d 551.

This Court addressed joinder and severance in *Solomon v. State,* 101 Md.App. 331, 646 A.2d 1064 (1994). We observed that prejudice of the type envisaged by Rule 4–253 is not "the legitimate damage to a defendant's cause that is incurred when *admissible* evidence is received against him." *Id.* at 348, 646 A.2d 1064 (emphasis in original). We also recognized a "substantive overlap" between the mutual admissibility test and the evidentiary law of "other crimes" evidence. *Id.* at 340, 350, 646 A.2d 1064. Consequently, we noted that "other crimes" may be joined if they fall within the recognized exceptions set forth in Rule 5–404, which include motive, intent, absence of mistake, identity, common scheme, and *modus operandi,* as well as "several offenses [ ] so connected in point of time or circumstances that one cannot be fully shown without proving the other." *Id.* at 350–54, 646 A.2d

1064 (citing *Tichnell v. State*, 287 Md. 695, 712, 415 A.2d 830 (1980); *Ross v. State*, 276 Md. 664, 670, 350 A.2d 680 (1976)).

█ In light of this precedent, the court undertakes a two-step process when severance is framed as a question of mutual admissibility, and we review the process for abuse of discretion. *See Conyers v. State*, 345 Md. 525, 554–56, 693 A.2d 781 (1997). First, the court must determine whether the evidence from the "other crimes" would be admissible if the trials occurred separately, taking into account the danger of unfair prejudice and other concerns under the usual evidentiary inquiry of Rule 5–403. *See id.* at 553–54, 693 A.2d 781. Second, if the evidence is deemed mutually admissible, then "any judicial economy that may be had will usually suffice to permit joinder unless other non-evidentiary factors weigh against joinder." *Id.* at 554–56, 693 A.2d 781.

Appellant argues that the crimes in this case vary so much that they cannot establish any common elements. Specifically, appellant argues that "burglaries are not uncommon," the knots used to hog-tie the victims were different, the ages of the victims spanned twenty-nine years, and the crimes occurred over a period of one year.

While there are slight differences between the crimes in this case, the record evidence also reveals overwhelming similarities among them. Each incident involved the confrontational home invasion of an elderly woman living alone, accosted by a man the three surviving victims consistently described as Hispanic. The victims all resided along the River Road corridor in houses that were within walking distance of each other. All of the home invasions occurred on a weekday between Monday and Wednesday. All of the victims were "hog-tied" with their hands and feet bound together, and gagged. Three of the victims were detained in their basements. Police found items stolen from each victim during a search of appellant's apartment, and in three of the incidents recovered DNA consistent with appellant's DNA.

Considering the totality of the circumstances, the numerous similarities between the cases are more than sufficient to

establish a distinctive *modus operandi*, and the common facts could prove the alleged identity. *See State v. Faulkner*, 314 Md. 630, 640, 552 A.2d 896 (1989) ("other crimes" evidence admissible where a right-handed robber wore a mask and gloves, carried a bag and a .22 caliber handgun, and stood on the Safeway checkout stands demanding money around the same time on multiple Friday nights); *McGrier v. State*, 125 Md.App. 759, 765, 726 A.2d 894 (1999) ("other crimes" evidence admissible where three female teenage victims were assaulted in the same building during the daytime and provided similar descriptions of their assailants).

■ Appellant argues that even if the "other crimes" evidence is relevant, it is outweighed by the danger that Mrs. Havenstein's murder would taint the jury's consideration of the other crimes. While we cannot refute that this possibility exists, we also cannot say that the trial court abused its discretion in holding that the danger of that occurrence is outweighed by the relevance and probative value of mutual admission, particularly in light of the aforementioned precedent set by *State v. Faulkner* and *McGrier v. State*.

Appellant's only other argument is that in light of "the overwhelming evidence the State had in its arsenal against appellant, including DNA evidence from three of the four crime scenes, it was hardly necessary to add three additional crimes to each individual one in order to establish identity and obtain a conviction." In other words, appellant argues that each charge should not only be separated *by incident* but *by the charges themselves*. Appellant's argument is not without merit, because it could be that multiple charges would lead to some confusion even if the incidents were tried separately, and that this confusion is made worse by the fact that they were all joined. But even if we accept appellant's argument, appellant's suggestion that it was "hardly necessary" to add the additional charges would not leave a viable alternative to resolve said charges. There can be little argument that a separate trial for each *count* would be impractical. Regardless of these procedural considerations, we are not of the

opinion that the trial court erred in its opinion that a jury could discriminate the combined facts and charges of this case.

It is clear from the trial court's extensive comments in the record that the court carefully analyzed the competing interests of proof and prejudice and did not abuse its discretion when it concluded that the evidence of each incident was mutually admissible. That being the case, and because appellant has not disputed that there was at least some judicial economy in proceeding with the charges jointly, we cannot say that the court erred when it denied appellant's motion to sever.

## II. Motion to Suppress Evidence

The police utilized two warrants to search appellant's apartment, in which he lived alone. The first warrant was issued upon probable cause to believe appellant had stolen personal property during a series of car break-ins. Among other things, the first warrant authorized the seizure of:

-Women's jewelry to include a gold watch, a gold ring, a second gold ring with yellow stones, and a yellow/white ring with six (6) small diamonds.

When the police executed the first warrant, they discovered that appellant had a large collection of "old-fashioned" women's jewelry in his apartment. During the search, one of the officer's found a bronze medallion commemorating the NASA Mercury astronauts on appellant's coffee table. The officer brought the medallion to the attention of the detective supervising the execution of the warrant who immediately suspected that it was related to the Havenstein home invasion. The police immediately suspended the search and subsequently obtained a second search warrant authorizing the seizure of items related to the four home invasion burglaries including "ladies' costume jewelry."

Prior to trial, appellant moved to suppress evidence recovered from his apartment pursuant to the two search warrants arguing that items recovered under the first warrant, specifically two "talking" watches and the NASA medallion, were not

within the scope of the warrant, and that the second warrant was impermissibly broad in its description of "costume jewelry" without further elaboration. After hearing contrary assertions from the State, the court determined that the "talking" watches were within the scope of the warrant's reference to "women's jewelry, to include a gold watch." As to the NASA medallion, the court concluded that the item was not jewelry within the scope of the first warrant, but that it was admissible under either the plain view or the inevitable discovery exceptions. Regarding the permissible scope of the second warrant's specification that the police were empowered to seize "costume jewelry," the court concluded:

> I think under the circumstances that, again, you're dealing with elderly victims. It's unlikely that even they could, from memory, describe to the officers in details all of the items in personal jewelry that they had that possibly were taken. Whereas, after the fact, when they looked at an item they would potentially be able to say, "That is mine. That isn't mine." So I don't think the fact that they use what might, might be a generic term, "lady's costume jewelry" in any way, shape, or form makes the warrant a general warrant.

Appellant asserts on appeal that the circuit court erred in denying his motion to suppress the seized evidence. Specifically, appellant argues that the talking watches recovered under the first warrant were unique, and thus they were outside the scope of the general description of "gold watch" utilized in the first warrant. Appellant further contends that the court properly determined that the commemorative medallion was outside the scope of the first warrant, but then improperly applied the plain view doctrine to allow its admission into evidence. Finally appellant posits that the court erred in finding that the general term "costume jewelry" utilized in the second warrant was sufficient to guide the officers in making a constitutional search. Appellant concludes that all of the challenged evidence should have been suppressed, and that reversal of his conviction is required.

In response, the State argues that the circuit court properly exercised its discretion in permitting the admission of the challenged evidence. Specifically, the State argues that the second warrant was as particular as possible under the circumstances of the case. The State further contends that the "talking" watches were properly seized under the first warrant, and that the NASA medallion was properly seized under the plain view doctrine. In the alternative, the State suggests that even if the warrants or searches at issue were unconstitutional, the challenged evidence would still be admitted under the good faith exception to the exclusionary rule.

■■■■ "In reviewing the ruling on a motion to suppress evidence, we consider only the evidence contained in the record of the suppression hearing." *Bost v. State*, 406 Md. 341, 349, 958 A.2d 356 (2008); *Rush v. State*, 403 Md. 68, 82–83, 939 A.2d 689 (2008). In making our ruling, we "review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party"—in this case, the State—but we "do not engage in *de novo* fact-finding." *Bost*, 406 Md. at 349, 958 A.2d 356; *Haley v. State*, 398 Md. 106, 131, 919 A.2d 1200 (2007). "Instead, we 'extend great deference to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous.'" *Padilla v. State*, 180 Md.App. 210, 218, 949 A.2d 68, *cert denied*, 405 Md. 507, 954 A.2d 468 (2008) (quoting *Brown v. State*, 397 Md. 89, 98, 916 A.2d 245 (2007)). However, "we make our own independent appraisal as to whether a constitutional right has been violated by reviewing the law and applying it to the facts of the case." *Id. See Crosby v. State*, 408 Md. 490, 504, 970 A.2d 894 (2009); *State v. Williams*, 401 Md. 676, 678, 934 A.2d 38 (2007).

■■■■ The Fourth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, states that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Constitution, Amend. IV; *Waters v. State*,

320 Md. 52, 56–57, 575 A.2d 1244, (1990) (citing *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). Similar protections are also embodied in Article 26 of the Maryland Declaration of Rights. *Frey v. State,* 3 Md.App. 38, 46, 237 A.2d 774 (1968). The requirement that warrants describe the items to be seized with particularity ensures that the executing officer is able to distinguish between those items within the scope of the warrant and those that are not. *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *accord, Brock v. State,* 54 Md.App. 457, 468, 458 A.2d 915 (1983).

First we shall consider appellant's challenge to the admission of two gold "talking" watches belonging to Mrs. Arnold under the first warrant's direction to seize "women's jewelry to include a gold watch." Preliminarily, we note that when Mrs. Arnold's watches were recovered, the police had no suspicion that appellant had been involved in the home invasions. The police were searching appellant's apartment for evidence connected to a series of automobile break-ins. They knew only to search for a woman's gold watch. There was no basis for the police to search specifically for Mrs. Arnold's talking watches until after they associated them with the crimes before us.

The plain language of the first warrant particularly constrained the police to seizing only gold women's watches. As the circuit court noted, both of the watches seized were gold. Appellant cites no authority for the proposition that a watch that "talks" is sufficiently unique and distinguishable from a non-talking watch to require its exclusion under a warrant authorizing the seizure of a woman's watch. We find no error in the circuit court's conclusion that Mrs. Arnold's talking watches were properly seized under the first warrant. *See, e.g., United States v. Hill,* 19 F.3d 984, 987 (5th Cir.1994) ("[E]vidence seized pursuant to a search warrant is not necessarily suppressible merely because the 'nomenclature assigned to these items by the defendant might differ from the descrip-

tion contained in the warrant.'" (quoting *United States v. Word*, 806 F.2d 658, 661 (6th Cir.1986))).

■ As to appellant's contention that the bronze NASA medallion was improperly seized, we accept the circuit court's finding that it was unlikely to be worn as jewelry. We further agree with the court that the medallion does not otherwise fall into any of the categories specified in the first warrant. Therefore, we must conclude that the medallion was outside the scope of the first warrant, and so was not legally seized unless it fell within one of the established exceptions to the warrant requirement. The circuit court concluded that the medallion was admissible under either the "plain view" or the "inevitable discovery" doctrine. On appeal, appellant challenges only the court's conclusion that the medallion was found in plain view.

■ In order to seize legally an item that is in plain view: (1) the police officer's initial intrusion must be lawful or the officer must otherwise properly be in a position from which he or she can view a particular area; (2) the incriminating character of the evidence must be "immediately apparent;" and (3) the officer must have a lawful right of access to the object itself.

*Wengert v. State*, 364 Md. 76, 88–89, 771 A.2d 389 (2001); *accord, Aiken v. State*, 101 Md.App. 557, 569–70, 647 A.2d 1229 (1994).

Appellant argues that the incriminating nature of the medallion was not "immediately apparent" to the officers conducting the search; and therefore, the police did not have probable cause to seize the medallion. In support of his argument, appellant points out that the medallion was not identified by Mrs. Havenstein's family until after it was illegally seized by the police.

■ We agree with the State, however, that appellant's argument confuses what is sufficient knowledge to support probable cause to seize a suspicious item, and what constitutes confirmation of that probable cause, which in this case did not

occur until the Havenstein family's identification of the medallion after it was seized. Probable cause requires only facts that would support an officer of reasonable caution in the belief that items may be stolen property; "it does not demand any showing that such belief be correct or more likely true than false." *Daniels v. State,* 172 Md.App. 75, 89, 913 A.2d 617 (2006).

The detective supervising execution of the search warrant at appellant's apartment had engaged in extensive discussions with the Havenstein family during which they disclosed that Mr. Havenstein had worked on the Mercury Space Mission. When the detective was called into appellant's living room to assess the medallion initially discovered by another officer,[2] he immediately suspected that the medallion had been taken from the Havenstein home. We conclude that the detective's reasonable suspicions regarding the medallion's provenance constituted sufficient probable cause to justify the seizure of the medallion found in plain view.

Finally, we shall address appellant's arguments regarding the scope of the language contained in the second warrant authorizing police to seize "costume jewelry" from appellant's apartment. Appellant argues that "costume jewelry" was too vague a term to provide guidance to the officers, who were essentially empowered to seize any piece of jewelry.

---

**2.** Appellant briefly argues that the initial disturbance of the medallion by the officer was an illegal seizure. But there is well-established authority that officers executing a warrant may inspect and disturb items to determine whether they fall within the warrant. *See United States v. Menon,* 24 F.3d 550 (3d Cir.1994) (holding that police officer who brought potential evidence to another officer during execution of a search warrant did not violate the Fourth Amendment). *See also* Wayne R. LaFave, *Search & Seizure* § 4.10(e) at 771 (4th ed. 2004) ("it is generally understood that a lawful seizure of apparent evidence of a crime pursuant to a search warrant carries with it a right to test or otherwise examine the seized materials to ascertain their evidentiary value."); *id.,* § 4.11(d) at 801 ("authority of police executing a warrant to seek out the named items and also to seize other items on probable cause if in plain view may permit both the 'inspection' and 'disturbing' of some articles other than those named in the warrant without violating *Hicks.*").

Appellant further asserts that the officers should have sought more detailed descriptions of the items from the victims of the home invasions and then utilized more restrictive language in the second search warrant. Appellant cites several cases in support of his contentions wherein courts ruled that the term "jewelry" was too broad when police officers had additional information regarding specific items that were missing. *United ed States v. Blakeney*, 942 F.2d 1001 (6th Cir.1991); *United States v. Fuccillo*, 808 F.2d 173 (1st Cir.1987); *Commonwealth v. Taylor*, 383 Mass. 272, 418 N.E.2d 1226 (1981).

In the instant case, however, there is no indication that at the time the police applied for the second warrant, they had specific information about particular items of costume jewelry that were missing from the home invasion victims. The instant case involved several elderly victims, all of whom were robbed of various items of jewelry. The second warrant included specific descriptions of several items of fine jewelry taken from the victims. The more general category of "costume jewelry" was presumably included to cover those less valuable items that were not specifically inventoried. During the initial search of appellant's apartment, police observed large amounts of "old-fashioned" women's jewelry that was uncharacteristic of the home of a thirty year-old man who lived alone. Under all the circumstances, we conclude that the warrant authorizing the search and seizure of "costume jewelry" was sufficiently particular, and we decline to reverse appellant's convictions on the asserted grounds.

### III. Merger of False Imprisonment and Robbery

The doctrine of merger of offenses for sentencing purposes is premised in part on the "double jeopardy" clause of the Fifth Amendment to the United States Constitution, applicable to state court proceedings via the Fourteenth Amendment. *Dixon v. State*, 364 Md. 209, 236, 772 A.2d 283 (2001) (citations omitted). To determine whether one offense merges into another, we utilize what is most often called the "required evidence test," *McGrath v. State*, 356 Md. 20, 23, 736 A.2d 1067 (1999) (citations omitted), also known as the

"same evidence test," the "Blockburger test," or the "elements test." *Dixon,* 364 Md. at 237, 772 A.2d 283.

The Court of Appeals summarized the required evidence test in *State v. Lancaster,* 332 Md. 385, 391–92, 631 A.2d 453 (1993):

> The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. Stated another way, the required evidence is that which is minimally necessary to secure a conviction for each offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, and where both offenses are based on the same act or acts, merger follows.

*Accord, McGrath v. State,* 356 Md. 20, 23–24, 736 A.2d 1067 (1999).

When merger is required, separate sentences are normally precluded; instead, a sentence may be imposed only for the offense having the additional element or elements. *See Dixon,* 364 Md. at 237, 772 A.2d 283 (citing *Nightingale v. State,* 312 Md. 699, 702, 542 A.2d 373 (1988)); *McGrath, supra,* 356 Md. at 24, 736 A.2d 1067. "Where there is a merger of a lesser included offense into a greater offense, we are not concerned with penalties—the lesser included offense generally merges into and is *subsumed* by the greater offense regardless of penalties." *Dixon,* 364 Md. at 238, 772 A.2d 283 (emphasis in original) (citing *Spitzinger v. State,* 340 Md. 114, 125, 665 A.2d 685 (1995); *Simms v. State,* 288 Md. 712, 722–23, 421 A.2d 957 (1980)); *see also Lancaster,* 332 Md. at 404–407, 631 A.2d 453.

 "False imprisonment, a common law offense, is the 'unlawful detention of another person against his [or her] will.'" *Marquardt v. State*, 164 Md.App. 95, 129, 882 A.2d 900 (2005) (citing *Midgett v. State*, 216 Md. 26, 39, 139 A.2d 209 (1958)). To obtain a conviction for false imprisonment, the State is required to prove: (1) that appellant confined or detained the victim; (2) that the victim was confined or detained against his or her will; and (3) that the confinement or detention was accomplished by force, threat of force, or deception. *Jones–Harris v. State*, 179 Md.App. 72, 99, 943 A.2d 1272 (2008).

 Robbery is defined as "the felonious taking and carrying away of the personal property of another from his person by the use of violence of by putting in fear." *Metheny v. State*, 359 Md. 576, 605, 755 A.2d 1088 (2000) (quoting *Williams v. State*, 302 Md. 787, 792, 490 A.2d 1277 (1985)); *accord, Coles v. State*, 374 Md. 114, 123, 821 A.2d 389 (2003). *See* CR § 3–401 (robbery retains its judicially determined meaning, with enumerated exceptions). To obtain a conviction for robbery, the State must prove: (1) that appellant took the property from the victim or the victim's presence and control; (2) that the appellant took the property by force or threat of force; and (3) that the appellant intended to deprive the victim of the property. Maryland Criminal Pattern Jury Instructions ("MPJI–Cr") § 4:28 (4th ed. 2002, 2007 Supp.).

In the instant case, the circuit court declined to merge the sentences for appellant's convictions of false imprisonment and robbery. Appellant relies upon this Court's decision in *Hawkins v. State*, 34 Md.App. 82, 366 A.2d 421 (1976), to support his contention that these convictions should have been merged for purposes of sentencing because the false imprisonment was "necessary to effectuate the robberies."

In *Hawkins*, utilizing the required evidence test, this Court concluded that it was necessary to merge a false imprisonment conviction into a rape conviction because the evidence established that "the victim was detained only a sufficient time to accomplish the rape," and therefore, "[a]ll of the facts neces-

sary to prove the lesser offense were essential to proving the greater one." *Id.* at 92, 366 A.2d 421. This Court has subsequently distinguished its holding in *Hawkins,* however, clarifying that merger is not required in cases where a victim is detained for longer than is necessary to accomplish the intended criminal act. *Jones–Harris v. State,* 179 Md.App. 72, 100, 943 A.2d 1272 (2008) (considering merger of false imprisonment and rape).

In the instant case, each of appellant's elderly female victims was tied up and detained even after appellant left her home, much longer than was necessary to accomplish the intended robbery. Under these circumstances, our decision in *Jones–Harris* trumps the rule from *Hawkins* and leaves appellant without a viable argument that the trial court erred; we therefore will not disturb the separate sentences imposed for those convictions.

### IV. Merger of Assault and Robbery

In the instant case, the circuit court declined to merge appellant's conviction for first-degree assault and robbery with a dangerous weapon of Mrs. Wolfe for sentencing purposes. Appellant argues that merger follows from the doctrine of lenity,[3] for which appellant cites *Abeokuto v. State,* 391 Md. 289, 356, 893 A.2d 1018 (2006):

> The rule of lenity was originally formulated by the United States Supreme Court as a principle of statutory construction. The policy behind the rule is that the Court will not interpret a criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what the legislature intended.

(Internal citations and quotations omitted.)

In *Wooten–Bey v. State,* 76 Md.App. 603, 547 A.2d 1086 (1988), *aff'd on other grounds,* 318 Md. 301, 568 A.2d 16 (1990),

---

**3.** Appellant argues that the rule of lenity applies "[e]ven if the charges do not merge under the required evidence test," but appellant never addresses how the required evidence test should apply to these charges. We will not, therefore, consider this argument.

we held that when two separate criminal statutes create separate offenses based on different criminal behavior with different criminal consequences, and there is no relevant legislative history suggesting that the Legislature intended to prohibit the imposition of separate sentences for the two separate crimes, the rule of lenity does not apply. *See id.* at 628–29, 547 A.2d 1086.

Appellant's argument is considerably lacking in substance, however, and its analysis is only:

In this case both offenses are aggravated offenses—"aggravated" assault and "aggravated" robbery. Further, both offenses were the product of the same conduct. Under these circumstances there is no basis for concluding that the Legislature intended multiple convictions and sentences.

In response, the State argues that the charges, in fact, arise out of two different criminal acts perpetrated by appellant against Mrs. Wolfe. Specifically, the State contends that appellant committed a robbery with a dangerous weapon when he accosted Mrs. Wolfe with a handgun. Appellant then separately committed a first-degree assault upon Mrs. Wolfe when he tied her limbs together in such a way as to cause permanent injury to her hands.

Appellant presents us with no reason that those two acts could not be considered separately, other than the single and broad assertion that "both offenses were the product of the same conduct." Furthermore, appellant has not explained how the similarly broad term "aggravated" establishes that our Legislature did not intend them to address different criminal behavior or impose separate sentences. Therefore, we conclude that the rule of lenity is not applicable to these charges, and the circuit court did not err in declining to merge appellant's sentences for robbery and assault of Mrs. Wolfe.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**